UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**JENNIFER M. WELTY,**

        Plaintiff,

    v.

**CAROLYN W. COLVIN,**
Acting Commissioner of Social Security,[1]

        Defendant.

Case No. 1:12-cv-01486-ST

**OPINION AND ORDER**

**STEWART, Magistrate Judge:**

Plaintiff, Jennifer Welty ("Welty"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. This court has jurisdiction under 42 USC § 405(g) and § 1383(c), and the parties have consented to adjudication by a Magistrate Judge. Because

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to FRCP 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this case.

the Commissioner's decision is not supported by substantial evidence, it is reversed and remanded for an award of benefits.

## ADMINISTRATIVE HISTORY

Welty filed applications for DIB and SSI in November 2008 alleging a disability commencing October 20, 2008, due to a car accident in October 2007 which aggravated her existing back pain, arthritis, and numbness. Tr. 155-65, 174.[2] After the Commissioner denied Welty's applications initially and upon reconsideration, she requested a hearing. Tr. 107-24, 128-29. That hearing was held on January 7, 2011, before Administrative Law Judge ("ALJ") Michael Gilbert. Tr. 45-102. On April 29, 2011, the ALJ issued a decision finding Welty not disabled. Tr. 15-30. The Appeals Council denied Welty's subsequent request for review on June 28, 2012, making the ALJ's decision the final Agency decision. Tr. 1-5. Welty now seeks judicial review.

## BACKGROUND

Born in 1970, Welty was 40 years old at the time of the hearing. Tr. 66. She completed the ninth grade, but did not finish high school or attain a GED. Tr. 68-69. She has past work experience as a manicurist and a hair stylist. Tr. 82, 90, 195-202.

## EVIDENCE

### I.  Medical Evidence

According to the medical records, Paul Matz, M.D., the primary care provider, has treated Welty for back pain since at least October 30, 2006, when he diagnosed unchanged neck pain, unchanged arthritis, and improved sciatica. Tr. 469-70. In March 2007, Welty reported that the pain in her neck and lower back were getting worse. Tr. 462. The next month she reported numbness in her left middle finger and constant pain in her back. Tr. 459. Dr. Matz

---

[2] Citations are to the page(s) indicated in the official transcript of the record filed on January 14, 2013 (docket #10).

Page 2 – OPINION AND ORDER

diagnosed this new problem as paresthesia (abnormal skin sensation) (Tr. 260) and referred her to Peter Grant, M.D., for an electrodiagnostic evaluation. Tr. 261.

When examining Welty in May 2007, Dr. Grant noted a tenderness to palpation in the cervical paraspinal, trapezius, and rhomboid muscles bilaterally with muscular rigidity and some myofascial nodules. Tr. 261-62. EMG and nerve conduction studies of her neck and arms were normal. *Id*. Dr. Grant diagnosed chronic muscular and myofascial neck, shoulder, periscapular, and upper extremity pain syndrome with upper extremity paresthesias. *Id.*

In July 2007 Welty reported to Dr. Matz that her shoulder and neck pain were getting worse. Tr. 456. Dr. Matz also noted that Welty had a depressed mood. Tr. 457. In August 2007, Dr. Matz diagnosed her arthritis as deteriorated. Tr. 453. He opined that Welty was "not medically stable to do her current job" and "would benefit from vocational rehabilitation." Tr. 514. In September 2007, Dr. Matz diagnosed polyneuropathy and administered Toradol for pain. Tr. 431, 439. On a form that appears to be dated October 5, 2007, Dr. Matz stated that Welty had cervical and lumbar arthritis of moderate severity with chronic neck and back pain and could not sit for prolonged periods. Tr. 512-13.

In mid-October 2007 after a motor vehicle accident, Welty reported neck pain and numbness in both hands to Dr. Welty. Tr. 423. A cervical MRI performed in December 2007 revealed degenerative disc narrowing with disc protrusion making contact with Welty's spinal cord. Tr. 412-13. In April 2008, Dr. Matz diagnosed sciatica and an anxiety disorder. Tr. 395.

In June 2008, Dr. Matz referred Welty to a neurologist for numbness in her left toe, burning sensations in her left foot, and drooping left eyelid. Tr. 392. In August 2008, Welty complained of right middle finger pain, redness, swelling, and tingling that Dr. Matz diagnosed as questionable Raynaud's Syndrome. Tr. 385-89. A cervical MRI in September 2008 revealed

disc herniation with minor flattening of Welty's spinal cord.  Tr. 312-13.  As a result, Dr. Matz diagnosed right cervical radiculopathy.  Tr. 381.

On a referral from Dr. Matz, Larry J. Kaukonen, M.D., a neurosurgeon, examined Welty in January 2009.  Tr. 301-03.  Finding no evidence of cord compression or radiculopathy and almost no change on MRIs over the last two years, he diagnosed "chronic muscle pain in her neck and shoulders secondary to overuse and exacerbated by her motor vehicle accident" and did not recommend surgery.  Tr. 303.

In 2009, Welty continued to report pain in her back, foot, and elbow, as well as finger numbness.  Tr. 572, 588, 609.  Based on his examinations, laboratory results and a nerve conduction test, Dr. Matz diagnosed Raynaud's Syndrome (vasospastic disorder causing discoloration of the fingers and toes) in May 2009 (Tr. 610), cervical radiculopathy on the right in June 2009 (Tr. 596), and polyarticular arthritis in August and September 2009.  Tr. 577-78, 589.

In September 2009, Welty returned to Dr. Grant.  Tr. 502.  Electrodiagnostic testing showed a moderate and chronic right ulnar neuropathy.  Tr. 503.  Dr. Grant opined that the greater part of her clinical symptoms was caused by chronic myofascial pain in the left neck, shoulder, periscapular, and upper extremity with associated upper extremity paresthesias.  Tr. 504.  He suggested wearing a protective pad, physical therapy, and further intervention.  *Id*.  Later that month, an ANA test (antinuclear antibodies) was positive (indicating the possible presence of an autoimmune disease).  Tr. 578.

Then in October 2009 after noting multiple positive trigger points, Dr. Matz also diagnosed fibromyalgia and depression for which he prescribed Celexa.  Tr. 570.

In November 2009, Welty was examined by Paul Sternenberg, M.D., an orthopedic surgeon. Tr. 540. He diagnosed a right ulnar nerve compression of the elbow and right lateral epicondylitis and recommended some conservative measures. Tr. 541. Absent improvement in her ulnar nerve symptoms, he felt she would be a candidate for surgery. *Id*.

Also in November 2009, David Walker, M.D., a neurosurgeon, examined Welty at the request of Dr. Matz. Tr. 517. He diagnosed chronic axial neck pain and possible right shoulder and elbow pathology with possible ulnar nerve palsy in the right elbow. Tr. 520. He wrote that only a few cases of axial neck pain can be successfully treated with surgery. *Id*. A few days later, Dr. Walker advised Welty that her MRI showed no evidence of neural impingement of the nerve roots or spinal canal. Tr. 516. He recommended home stretching and strengthening exercises. *Id*. Based on a lack of improvement after eight weeks of the recommended measures, Dr. Sternenberg recommended surgery. Tr. 542.

In December 2009, Dr. Matz again diagnosed Raynaud's Syndrome as deteriorated and fibromyalgia. Tr. 563. He also opined that Welty was still unable to return to work due to her impairments, which included arm neuropathy. Tr. 511.

In February 2010, Dr. Sternenberg performed a right ulnar nerve decompression at the elbow. Tr. 524.

In March 2010, Welty presented to Dr. Matz with a sudden shooting pain from her elbow into her hand. Tr. 544. Numbness had returned to the small and ring fingers and occasionally to the ulnar side of the hand. *Id*. He noted hypersensitivity around the elbow. *Id*. Her small and ring fingers felt cooler to the touch compared to her other fingers. *Id*. Dr. Matz advised Welty to stop smoking to improve the Raynaud's Syndrome. Tr. 549. She reported being overwhelmed with her children's multiple problems and appeared agitated. *Id*.

In May 2010, Welty continued to have numbness in her fingers after nine physical therapy visits. Tr. 646. Lateral epicondylitis was quite painful and any type of lifting caused a lot of pain. *Id*. Electrodiagnostic testing by Dr. Grant in June 2010 revealed right ulnar neuropathy at the elbow, moderate and chronic in nature, and essentially unchanged from previous testing. Tr. 626-34.

The next month, Welty reported not sleeping well and feeling chronically depressed. Tr. 618. She reported fatigue, malaise, paresthesias, depression, and anxiety. *Id*. In a letter dated July 2, 2010, Dr. Welty stated that Welty was still unable to work because of arm neuropathy. Tr. 612.

Dr. Sternenberg recommended a submuscular ulnar nerve transposition in July 2010 which he performed on August 24, 2010. Tr. 636, 643. By November 2010, Welty's sensation was essentially normal in her fingers. Tr. 638. However, Welty reported consistent paresthesias of her hands and feet, as well as skin hypersensitivity, constant low back pain, fatigue, malaise, weakness, paresthesias, depression, and anxiety. Tr. 649. Dr. Matz also noted that she had a depressed mood. Tr. 650.

In January 2011, David Dryland, M.D., a rheumatologist, examined Welty at the request of Dr. Matz to rule out inflammatory arthritis. Tr. 663. He noted that Welty appeared to be in obvious pain. Tr. 664. She had "mild glove/stocking dyschesia, but no weakness" and "definite 18/18 1+ fibro tender points." Tr. 665. Dr. Dryland suspected that all of her problem were caused by fibromyalgia, but noted "soft findings in the spine and FH [family history] of seronegative disease." *Id*. He wrote that her "tendinitis and compressive neuropathies with additional glove/stocking numbness is classic and long-standing fibromyalgia." *Id*. He planned

Page 6 – OPINION AND ORDER

lumbar and C-spine X-rays and, if they were negative, would conclude that all of her condition was fibromyalgia. *Id*. Dr. Dryland prescribed Methotrexate. Tr. 662.

In February 2011, Dr. Matz signed a letter prepared by Welty's attorney confirming that Welty could not work because of arm neuropathy and more generalized neuralgias. Tr. 682. The letter stated that he had reviewed Dr. Dryland's evaluation, which had shown an unusual amount of inflammatory arthritis, and explained the more generalized arthralgia symptoms that Welty had been experiencing. *Id*. The letter further stated that Dr. Dryland had prescribed Methotrexate, which he would not prescribe if he did not consider her inflammatory arthritis to be a significant and progressive problem. Tr. 682-83. In his opinion, Welty "would not be able to sustain a 40 hour workweek because of the severity of her symptoms." Tr. 683.

By March 2011, Welty was tolerating Methotrexate, but had no relief from it yet. Tr. 685. Dr. Dryland noted HLA (human leukocyte antigen) B27 positive (associated with inflammatory diseases) and a strong family history of seronegative (negative for rheumatoid factor) related diseases. *Id*.

At the hearing before the ALJ, William DeBolt, M.D., a neurologist testified based on his review of the medical records (Exhibits 1F-20F, ending July 2010) that Welty suffers from degenerative cervical spine disease, recurrent asthma, and an ulnar nerve transposition. Tr. 52-54. He opined that Welty had the physical capacity to perform light work with occasional reaching, pulling and use of the hand and limited exposure to fumes and dust. Tr. 55. He disagreed with Dr. Matz's opinion that Welty's arm neuropathy prevented her from working because the EMG study did not show any impairment of motor function or muscular function. Tr. 56, 59. Instead, he agreed with Dr. Kaukonen's opinion in January 2009 that Welty had "chronic muscle pain in her neck and shoulders secondary to overuse and exacerbated by her

Page 7 – OPINION AND ORDER

motor vehicle accident." Tr. 57, 303. He added that he saw no evidence of any rheumatological condition that would explain Welty's symptoms. Tr. 64-65.

## II. Welty's Testimony

At the hearing, Welty testified that her biggest obstacles to working are back pain from her neck to her tailbone and weakness and numbness in her right arm and hand. Tr. 71-73. She also has problems with numbness and burning sensations in her left foot. Tr. 73. She is unable to get out of bed two or three days per week because of her impairments. Tr. 74, 85. She is depressed because of her physical problems and takes Celexa and Xanax for anxiety and depression. Tr. 74-75. Welty also testified that she can sit for about 15 minutes before she needs to move or shift and has difficulty sitting because her lower back goes numb and her shoulders go forward. Tr. 84-85. She receives help from her parents, boyfriend, and oldest daughter on a regular basis when she cannot get out of bed. Tr. 85. She is "constantly cold" and aching and lies on a heating pad every day to help ease her back pain. Tr. 86.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999); 20 CFR §§ 404.1520, 416.920.

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(i), (b), 416.920(a)(4)(i), (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii), (c), 416.909, 416.920(a)(4)(ii), (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR §§ 404.1520(e), 416.920(e); SSR 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id* at 1100. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(v),416.920(a)(4)(v).

///

## **ALJ'S FINDINGS**

At step one, the ALJ found that Welty had not engaged in substantial gainful activity after the alleged onset date of October 20, 2008. Tr. 17. At step two, the ALJ found that Welty suffered from the severe impairments of degenerative disc disease of the cervical spine, recurrent asthma, right upper extremity neuritis status post ulnar nerve transposition, Raynaud's Syndrome, fibromyalgia, depression, and anxiety. *Id*. Given the lack of objective findings, he rejected inflammatory arthritis as a medically determinable impairment. Tr. 17-18. At step three, the ALJ found that Robinson did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 19.

The ALJ next assessed Welty's RFC and determined that she could perform light work with the following limitations: occasional reaching and pulling involving her right upper extremity; occasional exposure to pulmonary irritants; and simple, routine, repetitive tasks no more complex than a reasoning level of two as defined in the Dictionary of Occupational Titles ("DOT"). Tr. 20. At step four, the ALJ found Welty could not perform any of her past relevant work. Tr. 28. At step five, based on the testimony of a vocational expert ("VE"), the ALJ determined that Welty retains the ability to perform unskilled jobs that exist in significant numbers in the national economy, including bakery helper (light), charge account clerk (sedentary), and food and beverage order clerk (sedentary). Tr. 29. The ALJ therefore concluded that Welty is not disabled. Tr. 30.

## **STANDARD OF REVIEW**

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007); 42 USC § 405(g).. This court must weigh the evidence

that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).

## DISCUSSION

Welty contends that the ALJ erred by improperly rejecting the opinion of her treating physician, Dr. Matz, and her subjective symptom testimony. Because the ALJ's error with respect to Dr. Matz's opinion is dispositive, the ALJ's credibility finding need not be addressed.

### I.   Dr. Matz's Opinion

The ALJ is responsible for resolving conflicts in the medical record, including conflicts among physicians' opinions. *Carmickle v. Comm'r*, 533 F3d 1155, 1164 (9th Cir 2008). The Ninth Circuit distinguishes among the opinions of treating, examining, and non-examining physicians. The opinion of a treating physician is generally accorded greater weight than the opinion of an examining physician, and the opinion of an examining physician is accorded greater weight than the opinion of a non-examining physician. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995). An uncontradicted treating or examining opinion can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F2d 1391, 1396 (9th Cir 1991). If contradicted by another physician, the opinion of a treating or examining physician may be rejected only for "specific, legitimate reasons" supported by substantial evidence in the record. *Lester*, 81 F3d at

Page 11 – OPINION AND ORDER

830.  Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with medical records, inconsistency with a claimant's testimony, and inconsistency with a claimant's daily activities.  *Tommasetti*, 533 F3d at 1040.

The ALJ gave "great weight" to Dr. Matz's opinion that Welty could not perform her past work, but gave "no weight" to his opinion that she cannot sustain full-time work.  Tr. 25.  As support for this conclusion, he explained as follows:

> Other than indicating that inflammatory arthritis is a progressive condition that slowly gets worse, Dr. Matz did not provide any explanation for his conclusion.  Given that no acceptable medical source actually diagnosed inflammatory arthritis, the undersigned finds this less than convincing.  Dr. Matz did not offer a function-by-function analysis.  Dr. Matz did not identify what limitations [Welty's] impairments caused.  The undersigned finds that Dr. Matz's treatment records, which appeared to be based quite significantly on [Welty's] subjective reporting, do not demonstrate findings that would support his conclusion.

*Id.*

Despite Dr. Dryland's statement that Welty had a combination of risk factors that can suggest inflammatory arthritis, the ALJ correctly noted (and Welty concedes) that no acceptable medical source actually diagnosed inflammatory arthritis.  Tr. 685.  Despite the absence of a formal diagnosis, substantial evidence in the record reflects the presence of inflammatory arthritis.  Dr. Matz noted "an unusual amount of inflammatory arthritis" when reviewing Dr. Dryland's treatment notes.  Tr. 682.  Also as noted by Dr. Matz, Dr. Dryland prescribed Methotrexate, a medication for inflammatory arthritis.  Tr. 665, 682-83.  Thus, Dr. Matz's limitations related to arthritis were supported by substantial evidence in the record and should not have been rejected by the ALJ due to a lack of a formal diagnosis.

Contrary to the ALJ's opinion, Dr. Matz did identify limitations caused by Welty's impairments. In October 2007 Dr. Matz stated that Welty cannot sit for prolonged periods of time. Tr. 513. Although this statement predates the alleged onset date of October 2008, it is nonetheless relevant given that Welty's condition got worse, not better, since then. Moreover, Dr. Matz's explanation for Welty's inability to sustain full-time work was the inevitable worsening of an already significant problem. Tr. 683. He identified the same limitations as preventing Welty from returning to her past work or working a full week. The ALJ recognized such impairments in crediting the opinion that Welty's past relevant work was no longer an option. By doing so, the ALJ accepted certain functional limitations as a result of Welty's impairments identified by Dr. Matz.

The ALJ also erred by rejecting Dr. Matz's opinion that fibromyalgia would prevent Welty from fulltime work as supported by objective findings. Fibromyalgia is "a disease that eludes [objective] measurement," meaning that fibromyalgia pain cannot be proven objectively. *Benecke v. Barnhart*, 379 F3d 587, 594 (9th Cir 2004). Thus, normal medical findings or a lack of objective support in the record do not conflict with a finding of disability caused by fibromyalgia. Nonetheless, Dr. Dryland noted 18 out of 18 positive fibromyalgia tender points in February 2011 (Tr. 665) and stated in March 2011 that Welty was a "complicate[d] patient with fibromyalgia." Tr. 664. In addition, the ALJ identified Welty's diagnosed fibromyalgia as "definitive" (Tr. 25) and included the condition as a "severe impairment." Tr. 17. The ALJ's conclusion that Dr. Matz relied upon contrary findings is not supported by substantial evidence.

Dr. Matz's reliance on Welty's subjective reporting also is not a valid reason for the ALJ to reject his opinion. An ALJ cannot reject an examining physician's opinion by questioning the credibility of a claimant's complaints "where the doctor does not discredit those complaints and

supports his ultimate opinion with his own observations." *Ryan*, 528 F3d at 1199-1200. Dr. Matz did not question Welty's credibility. But even if the ALJ doubted Welty's credibility, Dr. Matz supported his ultimate opinion with his own observations based on a long relationship with Welty as her primary care physician, as well as with laboratory testing, referrals to numerous specialists, and diagnoses of other conditions found by the ALJ to be "severe." Thus, the ALJ's erred by relying on Welty's subjective reporting in order to reject Dr. Matz's opinion.

In contrast to Dr. Matz's opinion, the ALJ gave "significant weight" to the opinion of Dr. DeBolt, the reviewing neurologist. Tr. 25-26. The contrary opinion of a non-examining physician may constitute substantial evidence when it rests on objective clinical findings. *Allen v. Heckler*, 749 F2d 577, 579 (9th Cir 1984). Although acknowledging that Dr. DeBolt did not review the complete medical record, the ALJ concluded that the additional "exhibits did not produce objective findings contrary to previous evaluations or his testimony." Tr. 26. That conclusion is clearly erroneous. Dr. DeBolt did not review evidence that Welty's first surgery failed or Dr. Dryland's opinion that Welty's recurrent tendonitis and compressive neuropathies "is classic in long standing fibromyalgia." Tr. 627, 636, 665. Moreover, Dr. DeBolt was not aware that Welty was taking Methotrexate, a medication for inflammatory arthritis, or that she had been diagnosed with fibromyalgia. Tr. 662, 682. While the Commissioner speculates as to Dr. DeBolt's probable findings had he reviewed the entire record, Dr. Debolt's opinion based on an incomplete medical history cannot constitute substantial evidence sufficient to support the ALJ's conclusion.

By failing to provide specific and legitimate reasons for rejecting Dr. Matz's opinion in favor of Dr. DeBolt's contrary opinion, the ALJ erred.

///

**II.     Remand**

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d, 1172, 1178 (9th Cir 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Benecke*, 379 F3d at 593. The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *See Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir 2011).

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Benecke*, 379 F3d at 593. The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003). The reviewing court may decline to credit testimony when "outstanding issues" would prevent a disability determination. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As noted, the ALJ failed to provide legally sufficient reasons for rejecting Dr. Matz's opinion. Moreover, if Dr. Matz's opinion is credited, no outstanding issues must be resolved before a determination of disability can be made and that a finding of disability is appropriate.

Thus, a remand for further proceedings is unnecessary, and the Commissioner's decision is reversed and remanded for the immediate payment of benefits.

## ORDER

For the reasons discussed above, the Commissioner's decision that Welty is not disabled is REVERSED and REMANDED pursuant to Sentence Four of 42 USC § 405(g) for the immediate payment of benefits.

DATED this 25th day of September, 2013.

                                                                      s/ Janice M. Stewart_____
                                                                       Janice M. Stewart
                                                                       United States Magistrate Judge